**THOMAS R. RASK, III,** OSB No. 934031
TRASK@KELRUN.COM
**ZACHARY B. WALKER,** OSB No. 115461
ZWALKER@KELRUN.COM
**JOHN W. MAYER,** OSB No. 215105
JMAYER@KELRUN.COM
**STUART C. BARKER**, OSB NO. 254892
SBARKER@KELRUN.COM
Kell, Alterman & Runstein, L.L.P.
520 S.W. Yamhill, Suite 600
Portland, OR 97204
Telephone: 503/222-3531
Fax: 503/227-2980
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**HUNTER NEWTON, by and through BRIAN NEWTON, and JANETTE JOHNSON, as the appointed guardians and conservators.**

**Plaintiff(s),**

**v.**

**CLACKAMAS COUNTY; an Oregon county; COLTON ANDERSON, an individual, JASON BENTO, an individual, IZACH BROWN, an individual, BRANDON CORUM, an individual, AMANDA DERBY, an individual, DANIEL HILL, an individual, ABIGAIL HUNT, an individual, HUNTER JOHNSTON, an individual, DONALD MCCAFFERTY, an individual, NATHAN OLSEN, an individual, CASEY NEWTON, an individual, EVAN SANDERS, an individual, DEVIN WELLS, an individual, and GRANT ZAITZ, an individual.**

**Defendant(s).**

**Case No: -- CV. --------**

**COMPLAINT**

**42 U.S.C. § 1983; Assault/Battery; Negligence**

**DEMAND FOR JURY TRIAL**

For his Complaint against Defendants, Plaintiffs allege as follows:

## I. INTRODUCTION

1. On or about September 30, 2024, 21-year-old Hunter Newton ("Hunter" or "Plaintiff") was driving home from visiting friends and was pulled over for a minor traffic infraction by the City of Milwaukie Police Department. As alleged below, Plaintiff was unarmed and posed no threat to law enforcement. However, the encounter with City of Milwaukie Police Department resulted in officers discharging their weapons into the rear windshield of the vehicle. Plaintiff was shot in the back of his shoulder and in the back of his head while he was seated, facing forward and fastened to his seat. Immediately after the shooting, the Clackamas County Sheriff's office took over the scene. For approximately forty minutes, the Clackamas County Sheriff's office withheld medical aid. During this period of time, deputies shot Plaintiff with non-lethal projectiles, chemical irritants and sought purported compliance of Plaintiff while he was critically injured and in need of intensive care.

## II. JURISDICTION AND VENUE

2. This is an action for damages under 42 U.S.C. § 1983 for violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution. This court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(1), (3) and (4). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because those claims are related to Plaintiff's federal law claims and arise out of a common nucleus of operative fact. Plaintiff's state law claims are related to Plaintiff's federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Defendants' acts occurred in the District of Oregon and, at all material times, the parties resided or did business in the State of Oregon.

///



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

## III. PARTIES

4. At all material times, Plaintiff Hunter Newton ("Hunter") was a resident of Milwaukie, Oregon. As a result of Defendants' conduct, Hunter has been deemed an incapacitated adult under Oregon law. Hunter's biological parents, Brian Newton and Janette Johnson, have been appointed as co-guardians and co-conservators for Hunter in the case entitled *Guardianship and Conservatorship of Hunter D. Newton, Clackamas County Circuit Court, Case No. 24PR02335.* Brian Newton and Janette Johnson are residents of Clackamas County, Oregon.

5. Defendant Clackamas County is a political subdivision of the State of Oregon. The Clackamas County Sheriff's Office ("CCSO") is a department or division of Clackamas County.

6. At all times mentioned herein, Defendants Colton Anderson, Jason Bento, Izach Brown, Brandon Corum, Amanda Derby, Danial Hill, Abigail Hunt, Hunter Johnston, Donald McCafferty, Nathan Olsen, Casey Newton, Evan Sanders, Devin Wells, and Grant Zaitz (collectively the "Individual Defendants") were all officers employed by CCSO. The Individual Defendants and CCSO are hereinafter collectively "Defendants."

7. Prior to the filing of this lawsuit, the City of Milwaukie resolved claims asserted by Plaintiff pursuant to a covenant not to sue in accordance with ORS 31.815.

## IV. ALLEGATIONS

### A. Hunter Was Pulled Over by the City of Milwaukie Police Department For a Moving Violation.

8. On or about September 30, 2024, Hunter was driving home after visiting friends and going to the gym late in the evening. He drove to a Taco Bell located at 11000 SE Oak St, Milwaukie, Oregon to get something to eat before going home for the evening.

9. At approximately 12:50 a.m., City of Milwaukie Police Department ("MPD") Sergent Eduardo Sanchez ("Sergent Sanchez") began to follow Hunter on Oak Street, which near the MPD building. Sergeant Sanchez pulled Hunter over as he pulled into the Taco Bell parking area because Hunter did not signal 100 feet prior to initiating a turn. A few moments later, MPD Officer



**KELL, ALTERMAN & RUNSTEIN, L.L.P.**
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

Kwasean Akom arrived as Sergeant Sanchez's cover officer. It was determined during the initial part of the stop that Hunter had a suspended driver's license.

10. During the entirety of the interaction between Hunter and the MPD officers, both officers had the cabin of the vehicle illuminated by their flashlights and observed Hunter open the glove box and/or the center console. Neither officer observed any weapon in the vehicle. Neither officer made observations about Hunter being under the influence of intoxicants.

11. Sergeant Sanchez decided to arrest Hunter for his suspended driver's license, rather than issue him a citation, but did not inform Hunter of the issue. Hunter was instructed to exit the vehicle and, when he asked why, Sergeant Sanchez responded aggressively. Hunter attempted to roll up his window and both MPD officers opened the driver's side door and began pulling Hunter from his seat, but he was belted into the driver's-side seat at the time.

12. Approximately thirty seconds later, while each MPD officer had access to and visibility of Hunter's hands and while he was seated in his chair, there was an unidentified sound from somewhere behind Sergeant Sanchez. Subsequent investigations by MPD and other police agencies have been unable to identify the source of the sound, but it was quieter than and sounded distinct from a gunshot.

13. After the unidentified noise, both MPD officers ran to the rear of Hunter's vehicle and collectively shot sixteen (16) rounds into the vehicle while Hunter was seated in the driver-side seat facing forward.

14. Through the broken passenger side window, one or both of the above-alleged MPD officers were able to observe Hunter slumped over the center console of the vehicle and that Hunter had limited movement, if any.

**B. CCSO Arrive on Scene.**

15. Officers from CCSO, including the Individual Defendants, began arriving at the scene at approximately 12:58 a.m. Shortly thereafter, CCSO officers were in primary command of the scene.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

16. On information and belief, CCSO and the Individual Defendants knew, should have known, or had the ability to learn quickly all the facts detailed in the above-alleged paragraphs regarding the shooting.

17. At approximately 12:58 a.m., Officer Akom told Defendant Colton Anderson, a CCSO Deputy Sheriff, that Hunter was "slumped over the passenger seat." Deputy Anderson stated to Akom that "we," referring to CCSO, had the requirement to immediately render first aid to Hunter. However, as alleged below, the obligation to render aid was delayed or ignored by the Individual Defendants and/or because of commands from Sergeant Zaitz, Sergeant Hill, and/or the result of policies, practices or procedures of CCSO.

18. Instead, for nearly 40 minutes, the Individual Defendants repeatedly yelled contradictory commands at Hunter including that he needed to "put his hands up," "put his hands on the dash," and other commands, warning that he would be shot if he did not comply. Hunter did not respond to these commands or give any indication that he heard them.

19. Deputy Hunt arrived on the scene at approximately 1:00 a.m. Sergeant Hill arrived on scene at approximately 1:01 a.m. Sergeant Zaitz arrived on scene at approximately 1:05 a.m. Sergeant Hill and/or Sergeant Zaitz were primary command of CCSO and the Individual Defendants.

20. Other CCSO deputies arrived over the next 10 minutes, including Defendants Izach Brown, Brandon Corum, Hunter Johnston, Nathan Olsen, Casey Newton, Devin Wells, Evan Sanders, Donald McCafferty, Amanda Derby, and Janson Bento. All of these individuals held the rank of Deputy Sheriff, and were subordinate to Sergeant Hill and Sergeant Zaitz.

21. Upon arriving, none of the CCSO deputies made any attempt to approach the vehicle, investigate Hunter's condition, or provide first aid.

22. At 1:02 a.m., CCSO Deputy Brown asked Sergeant Sanchez and Officer Akom what Hunter had been "armed with." The MPD officers told Deputy Brown that they had not seen a weapon, but that "there was a pop, that's it." Deputy Brown asked the MPD officers, "so you didn't see a gun, or anything?" Sergeant Sanchez confirmed that they had not.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

23. After CCSO arrived, Hunter would periodically move in his seat. At 1:02 a.m., a CCSO deputy stated to the other CCSO personnel present, "I don't think that's super conscious movement," referring to Hunter's periodic movement of his arms and head. The CCSO deputy further stated, "his eyes aren't open, he's just kind of flailing."

24. An ambulance arrived at the scene at approximately 1:05 a.m. As a result of Defendants' conduct alleged herein, first responders were kept away the scene and not allowed to immediately render aid to Hunter.

25. By 1:05 a.m., there were about a dozen CCSO officers on the scene. Deputy Brown positioned himself partially behind a tree approximately four feet away from Hunter, behind him and to his left. Deputy Brown had a clear view of Hunter and had an assault rifle aimed at Hunter's back at nearly point-blank range.

26. At 1:05 a.m., a CCSO officer stated that he could see Hunter's empty left hand, which he had been "moving this whole time," and Deputy Brown responded that he could see Hunter's right hand as well. At the same time, Deputy Hunt, who was standing next to Sergeant Zaitz, stated that she had seen both his hands "a second ago," and they were both empty. All the officers continued to shout at Hunter that they could not provide medical aid until he put his hands in various contradictory positions, including "on the dash," "on his head," or "on the steering wheel." Hunter did not react.

27. By this time, information available to CCSO and the Individual Defendants indicated that it was likely Hunter had been injured, that Hunter did not have a weapon in his hands, and that MPD had not seen any firearm in the vehicle or on Hunter.

28. At 1:07 a.m., Deputy Hunt fired a 40-millimeter high-velocity less-lethal round at Hunter's upper torso. Deputy Hunt later stated that her goal in firing this weapon at Hunter was to force him to comply with commands by inflicting pain.

29. One minute later, after Hunter remained unresponsive, Deputy Hunt fired another 40-millimeter round, this one equipped with chemical irritants, at Hunter, with the same goal of inflicting pain. Hunter did not react.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

30. Manufacturer recommendations for this 40-millimeter ammunition recommend that a subject should not be struck with the ammunition above the nipple line due to concern that it can cause significant injury or death if a subject is struck in the head or neck. Deputy Hunt violated this recommendation by aiming at Hunter's upper chest. While on scene, at least one CCSO officer joked about striking Hunter in the head with a 40-millimeter ammunition round.

31. On information and belief, Sergeant Zaitz or Sergeant Hill gave the order to Deputy Hunt to fire at Hunter and/or that she did so pursuant to the expectations of Sergeant Zaitz, Sergeant Hill or the policies, practices and customers of CCSO.

32. At 1:08 a.m., Deputy Brown stated to the other CCSO officers that he could see a wound in the back of Hunter's head. Defendants did not change tactics and continued shouting at Hunter that they "cannot" give him medical aid until he consciously put both of his hands out of the car.

33. At 1:08 a.m., Hunter's left hand fell out of the driver's side window. At approximately 1:09 a.m., another CCSO deputy stated, "OK, both hands are empty."

34. At 1:12 a.m., Officer Brown stated that Hunter did not appear to have anything in his lap.

35. At 1:13 a.m., Officer Hunt fired another 40-millimeter chemical round at the vehicle. When Hunter remained non-responsive, Deputy Hunt stated to Sergeant Zaitz and the other CCSO officers nearby, "he just does not care about that at all. This is, like, super abnormal."

36. At 1:14 a.m., Deputy Brown and another CCSO officer asked Sergeant Sanchez if he thought Hunter was intoxicated when he pulled him over. Sanchez responded, "I don't think so, he didn't seem like it."

37. At 1:17 a.m., Officer Brown stated that he could see blood on the center console and guessed that Hunter had "been shot" based on "the way he's acting." Officer Brown also stated that he could see blood coming down the back of Hunter's sweatshirt under his arm and a bullet hole in the back of his neck.

38. At approximately 1:18 a.m., a CCSO deputy again asked Sergeant Sanchez about the shooting. Sergeant Sanchez and Officer Akom repeated that they had heard a "pop," but made clear that neither had seen a weapon in Hunter's vehicle.


KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

39. No later than 1:18 a.m., CCSO and the Individual Defendants knew or should have known the following:

a. Neither Sergeant Sanchez or Officer Akom observed any firearm on Hunter's body, his hands or the vehicle;

b. Hunter had been shot and there was blood on the back of his head;

c. Both of Hunter's hands appeared to be empty;

d. Hunter's movement was labored and he was unable to comply with any commands; and

e. MPD had fired multiple rounds into the vehicle, likely critically injuring Hunter.

40. Defendants continued to withhold medical care from Hunter for nearly 20 more minutes.

41. At 1:22 a.m., Deputy Brown stated that he was "almost" to the point where he thought they should approach the vehicle, and that he didn't know if Hunter had the "mental wherewithal" to respond to their commands. At this point, Defendants had been shouting at him with no response for nearly half an hour and Deputy Hunt had fired three 40-millimeter rounds at him, with no indication that Hunter could physically comply with commands. Another 18 minutes would pass before CCSO would allow paramedics to provide medical care, during which time CCSO deployed needless equipment, including flying a drone in front of Hunter's car at approximately 1:26 a.m.

42. At 1:37 a.m., Deputy Hunt, Deputy Brown, and several other CCSO officers finally approached the vehicle from behind a ballistic shield. The officers could see blood inside the car and multiple gunshot wounds to Hunter's head and shoulder. Hunter was non-responsive. As they pulled Hunter's body from the vehicle, one of the deputies shouted "stop fighting, dude!" The officers then dragged Hunter across the ground and handcuffed him.

43. At 1:39 a.m., CCSO finally allowed the paramedics, which had been on site since 1:05 a.m., to administer first aid to Hunter.

44. At 1:43 a.m., the paramedics loaded Hunter into an ambulance which took him to Oregon Health and Science University.

45. All of the Individual Defendants had the duty to immediately render aid to Hunter when safe to do so. At all material times, the Individual Defendants were acting under the color of law.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

46. On information and belief, Seargeant Zaitz and/or Sergeant Hill were the CCSO officers who made the decision to withhold medical care from Hunter for nearly 40 minutes after CCSO took control of the scene. On information and belief, CCSO has a policy, practice of custom of failing to deliver aid to injured suspects like Hunter, which are those that purportedly caused danger to a fellow officer.

47. As a result of the shooting, Hunter suffered the following injuries, one or more of which was exacerbated due to the delay in care:

a. Multicompartmental intracranial hemorrhage with retained intercranial ballistic fragment in the left frontal lobe, requiring surgical procedure for right front temporoparietal decompressive hemicraniectomy repair of right parietal scalp wound, debridement of necrotic scalp and brain;
b. Intraparenchymal hemorrhage and subarachnoid hemorrhage;
c. Interventricular hemorrhage;
d. Left-side ballistic shoulder scapular body fracture requiring surgical repair;
e. Paroxysmal sympathetic hyperactivity;
f. Ventriculitis;
g. Acute hypoxic respiratory failure;
h. Encephalitis;
i. Meningitis;
j. Hydrocephalus;
k. Surgical intervention needed to insert a tracheostomy tube and surgery required to insert a feeding tube;
l. Traumatic brain injury; and
m. Right side limb paralysis.

48. In addition to the exacerbation of one or more of the above-alleged injuries, the delay in care prohibited airway management, ventilation or supplemental oxygen, resulting in anoxic and hypoxic-ischemic injury. As a result, Hunter suffered global hypoxic-ischemic injury


KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

superimposed on the penetrating gunshot injury, causing worsened brain injury and corresponding life-long cognitive and physical limitations, all of which are permanent in nature.

49. Hunter has received reasonable and necessary treatment for the above-alleged injuries and Hunter is not medically stationary.

50. Some or all of the injuries listed above are permanent. Hunter will be permanently physically and cognitively disabled for the remainder of his life. Hunter cannot ambulate or communicate effectively, nor will he be able to do so in the future. Hunter will require life-long care.

51. At the time of this incident, Hunter was employed as an unarmed security guard. Hunter intended to apply for job at a local police force. As a result of his injuries, Hunter will be physically and cognitively unable to rejoin the work force in any capacity. Hunter will not be medically fit to work in any material capacity for the remainder of his life.

52. At the time of the incident, Hunter was 21 years old.

53. Immediately after Hunter was removed from the scene, CCSO confirmed via a search of Hunter's vehicle that no weapon was in the vehicle. CCSO further confirmed that no weapon was on Hunter's person or in his clothes.

54. Despite confirmation that no weapon was on Hunter's person or in his vehicle, CCSO immediately began investigating Hunter, which included review of Hunter's social media, questioning Hunter's friends about his views on law enforcement and whether he owned a weapon, and questioning Hunter's parents while they were in the hospital. CCSO further went to Hunter's apartment without a warrant and demanded Hunter's landlord allow them to search Hunter's home for a weapon or for information about Hunter's purported dislike of law enforcement. On information and belief, CCSO engaged in these post-shooting activities because it sought justification for unjustifiable law enforcement conduct.

55. CCSO's policy, practice or custom of delayed medical care is long-standing. In June 2022, CCSO deputies shot Derrick Dewayne Clark Jr. in the back and then left him bleeding on the



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

ground for nearly two hours, despite witnessing Mr. Clark throw away his weapon before being shot.

56. Sergeant Zaitz was the commanding officer on the scene in the Clark incident. Also present at both the Clark incident and the events described in this Complaint were Deputies Bento and McCafferty. Mr. Clark's estate filed suit against Clackamas County and other individual officers in December 2023 pursuant to matter entitled *Miles et al v. Clackamas County et al*, District of Oregon Case No. 3:23-cv-1805-SB.

57. On information and belief, CCSO did not make any substantive policy changes in response to the Clark incident or the Miles lawsuit prior to the incident involving Hunter.

58. On information and belief, Sergeant Zaitz, the commanding officer on the scene for the death of Mr. Clark in CCSO's custody, faced no disciplinary actions as a result and remained in a supervisory position. Sergeant Zaitz would carry out CCSO's policy of withholding aid from people who had been shot by police with Hunter just as he had with Mr. Clark.

59. On information and belief, neither Sergeant Zaitz, Sergeant Hill, Deputy Hunt, or any other CCSO deputy have faced any discipline or repercussions from CCSO from their actions with regard to Hunter.

60. On March 25, 2025, Plaintiffs timely filed a tort claim notice.

**FIRST CLAIM FOR RELIEF**

**(Against Defendant Hunt)**

**(42 U.S.C. § 1983 – Fourth Amendment)**

61. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

62. The Fourth Amendment of the United States Constitution prohibits the use of excessive force, i.e. force that is objectively unreasonable under the circumstances, in the course of an arrest, investigatory stop, or other seizure.

63. At all times relevant to the liability allegations of this Complaint, Defendant Hunt was acting under the color of law—under the constitutions, statutes, administrative rules, customs, policies, and usages of the State of Oregon and the United States—and had assumed the

responsibilities, activities, and rights involved in exercising her role as a CCSO officer.

64. Defendant Hunt, in spite of the foreseeable risk of harm to Hunter, acted with deliberate indifference to Hunter's known and recognized constitutional and legal right under the Fourth Amendment to be free from excessive force, in one of more of the following ways:

a. By firing multiple rounds from a 40-millimeter weapon at Hunter while he was non-responsive and did not pose a threat to Deputy Hunt;

b. By aiming and firing the weapon at Hunter's shoulder/chest, against manufacturer recommendations and acceptable standards, policies and practices for the use of the weapon; and/or

c. By using the 40-millimeter weapon with the intention of inflicting pain on Hunter, not with the intention of stopping Hunter from posing a threat to her or other officers.

65. One or more of the above-alleged actions by Deputy Hunt were contrary to acceptable law enforcement standards, policies, practices or procedures.

66. The actions by Deputy Hunt were objectively unreasonable in the context of her interactions with Hunter, who was unarmed and the totality of the circumstances showed that he was injured. As a result of the actions of Deputy Hunt, Hunter has been deprived of his rights under the Fourth Amendment of the United States Constitution. Hunter has suffered physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial.

67. As a result of the actions of Deputy Hunt, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress and diminished quality of life in an amount to be proven at trial.

68. Hunter is entitled to an award of punitive damages.

69. Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

**SECOND CLAIM FOR RELIEF**

**(Against all Individual Defendants)**

**(42 U.S.C. § 1983 – Fourteenth Amendment)**

70. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

71. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that police officers provide or seek medical aid to persons injured in their custody or while being apprehended by police.

72. At all material times after CCSO took command of the scene, Hunter was in the custody or control of CCSO.

73. At all times relevant to the liability allegations of this Complaint, the Individual Defendants were acting under the color of law—under the constitutions, statutes, administrative rules, customs, policies, and usages of the State of Oregon and the United States—and had assumed the responsibilities, activities, and rights involved in exercising their roles as CCSO officers.

74. On or soon after CCSO took command of the scene, the Individual Defendants had actual or constructive knowledge of one or more of the following:

a. Neither Sergeant Sanchez, Officer Akom or any other CCSO officer observed a weapon on Hunter’s person or in his vehicle;

b. The only rationale for Sergeant Sanchez and Officer Akom for shooting Hunter was an unidentified noise that was purportedly loud;

c. The number of shots fired by Sergeant Sanchez and Officer Akom and the distance from which they fired made it very likely that at least one of the shots had hit Hunter;

d. Sergeant Sanchez and Officer Akom had seen Hunter slump over the passenger seat after they fired at him;

e. Multiple CCSO officers had a clear shot at close range should Hunter have made any threatening movements, including especially Deputy Brown;

f. Multiple CCSO officers had confirmed that Hunter did not have anything in either hand;



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

g. CCSO officers could see that Hunter was injured, including observations that Hunter was bleeding from his head or neck area;

h. The CCSO officers present had equipment such as ballistic shields that they could have used (and eventually did use) to approach the vehicle safely;

i. Hunter did not make any threatening movements, attempt to escape, or respond to instructions in any material way; and/or

j. Hunter's physical condition deteriorated during the period of time he sat in the vehicle.

75. The Individual Defendants, in spite of the foreseeable risk of harm to Hunter, acted with deliberate indifference to Hunter's known and recognized constitutional and legal right under the Fourteenth Amendment to be provided medical care after being injured by police officers. Specifically, the Individual Defendants withheld medical care or ordered, instructed, or allowed the CCSO officers present to withhold emergency medical aid from Hunter for nearly 40 minutes, despite actual or constructive knowledge of one or more of the above-alleged facts.

76. As a result of the actions of the Individual Defendants, Hunter has been deprived of his rights under the Fourteenth Amendment of the United States Constitution. Hunter has suffered exacerbation to grievous physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial for incurred medical treatment and for future medical treatment necessary rehabilitation, equipment, nursing care, residential treatment and in-home care.

77. As a result of the Individual Defendants' conduct, Hunter has suffered exacerbation to injuries prohibiting him from obtaining or retaining employment. Hunter is entitled to compensatory damages for lost earnings and lost earning capacity in an amount to be determined at trial.

78. As a result of the Individual Defendants' conduct, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress, and diminished quality of life in an amount to be proven at trial.

79. Hunter is entitled to an award of punitive damages.


KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

80. Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**(Against Defendant Clackamas)**

**(42 U.S.C. § 1983 – Fourteenth Amendment)**

81. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

82. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that police officers provide or seek medical aid to persons injured in their custody or while being apprehended by police.

83. At all times relevant to the liability allegations of this Complaint, Defendant CCSO had a custom or policy of withholding medical care to suspects in Defendant CCSO's custody who had been injured by police and/or subjects suspected of threats against police. This custom or policy was either:

a. A policy adopted by a final decision-making authority within Defendant CCSO, including but not limited to Sergeant Zaitz and Sergeant Hill, who were the supervising officers on the scene on the night that CCSO officers withheld medical care from Hunter;

b. A custom within CCSO that is a sufficiently widespread, well-settled practice that it constitutes the standard operating procedure; or

c. The result of inadequate training and/or supervision and Defendant CCSO's deliberate indifference to the likelihood that CCSO officers would violate the constitutional rights of injured persons in CCSO custody.

84. Pursuant to the customs and policies of Defendant CCSO, its officers withheld emergency medical care from Hunter for nearly 40 minutes, when they knew, or reasonably should have known, that Hunter was seriously injured, and they could have provided medical care at only minimal risk to themselves.

85. Defendant CCSO instituted these customs and policies with the knowledge that they would result in CCSO officers withholding medical care from persons who had been injured by police.

86. As a result of the actions of Defendant CCSO, Hunter has been deprived of his rights under the Fourteenth Amendment of the United States Constitution. Hunter has suffered grievous physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial for incurred medical treatment and for future medical treatment necessary rehabilitation, equipment, nursing care, residential treatment and in-home care.

87. As a result of the actions of Defendant CCSO, Hunter has been injured in his ability to obtain and retain employment. Hunter is entitled to compensatory economic damages for lost wages and lost earning capacity in an amount to be proven at trial.

88. As a result of the actions of Defendant CCSO, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress and diminished quality of life in an amount to be proven at trial.

89. Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**(Against Defendant Clackamas)**

**(42 U.S.C. § 1983 – Fourth Amendment)**

90. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

91. The Fourth Amendment of the United States Constitution prohibits the use of excessive force, i.e. force that is objectively unreasonable under the circumstances, in the course of an arrest, investigatory stop, or other seizure.

92. At all times relevant to the liability allegations of this Complaint, Defendant CCSO had a custom or policy of using excessive force on suspects believed to be involved in threats to law enforcement. This custom or policy was either:

   a. A policy adopted by a final decision-making authority within Defendant CCSO, including but not limited to Sergeant Zaitz and Sergeant Hill, gave Deputy Hunt the order to use the 40-millimeter on Hunter;



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

b. A custom within CCSO that is a sufficiently widespread, well-settled practice that it constitutes the standard operating procedure; or

c. The result of inadequate training and/or supervision and Defendant CCSO's deliberate indifference to the likelihood that CCSO officers would violate the constitutional rights of persons who come into contact with CCSO.

93. Pursuant to the customs and policies of Defendant CCSO, one or more of the Individual Defendants:

a. Fired multiple rounds from a 40-millimeter weapon at Hunter while he was non-responsive and did not pose a threat to Deputy Hunt or the other officers present;

b. Aimed the weapon at Hunter's shoulder/chest, against the policies recommended by the weapon's manufacturer;

c. Used the 40-millimeter weapon with the sole intention of inflicting pain on Hunter, not with the intention of stopping Hunter from posing a threat to her or other officers; and/or

d. Aided, abetted, or encouraged the above-alleged conduct.

94. Defendant CCSO, instituted these customs and policies with the knowledge that they would result in CCSO officers using excessive force in violation of the Fourth Amendment.

95. As a result of the actions of Defendant CCSO, Hunter has been deprived of his rights under the Fourteenth Amendment of the United States Constitution. Hunter has suffered grievous physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial for incurred medical treatment and for future medical treatment necessary rehabilitation, equipment, nursing care, residential treatment and in-home care.

96. As a result of the actions of Defendant CCSO, Hunter has been injured in his ability to obtain and retain employment. Hunter is entitled to compensatory economic damages for lost wages and lost earning capacity in an amount to be proven at trial.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

97. As a result of the actions of Defendant CCSO, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress and diminished quality of life in an amount to be proven at trial.

98. Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM FOR RELIEF**

**(Against All Defendants)**

**(Assault and Battery)**

99. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

100. Defendants caused harmful and offensive physical contact of Hunter without sufficient cause or threat and the force used was objectively unreasonable under the circumstances.

101. As a direct and proximate result Hunter has suffered grievous physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial for incurred medical treatment and for future medical treatment necessary rehabilitation, equipment, nursing care, residential treatment and in-home care.

102. As a direct and proximate result, Hunter has been injured in his ability to obtain and retain employment. Hunter is entitled to compensatory economic damages for lost wages and lost earning capacity in an amount to be proven at trial.

103. As a direct and proximate result, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress and diminished quality of life in an amount to be proven at trial.

104. Hunter is further entitled to his costs and disbursements.

**SIXTH CLAIM FOR RELIEF**

**(Against All Defendants)**

**(Negligence)**

105. Plaintiffs reallege paragraphs 1 through 60 as though fully set forth herein.

106. At all material times after CCSO arrived on scene of the shooting, Hunter was under its custody or control.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

107. Defendants had a duty to exercise reasonable care in allowing Hunter to receive emergency medical care for the injuries he suffered as a result of being shot and further had a duty to avoid the foreseeable risk of danger from the delayed provision of medical aid.

108. Defendants knew or should have known that Hunter was seriously injured and had an urgent need for emergency medical care. Defendants breached their duties to Hunter by failing to provide emergency medical aid.

109. As a direct and proximate result Hunter has suffered grievous physical injuries, some or all of which will be permanent in nature. Hunter is entitled to compensatory economic damages in an amount to be proven at trial for incurred medical treatment and for future medical treatment necessary rehabilitation, equipment, nursing care, residential treatment and in-home care.

110. As a direct and proximate result, Hunter has been injured in his ability to obtain and retain employment. Hunter is entitled to compensatory economic damages for lost wages and lost earning capacity in an amount to be proven at trial.

111. As a direct and proximate result, Hunter has suffered and will continue to suffer fear, anxiety, emotional distress and diminished quality of life in an amount to be proven at trial.

112. Hunter is further entitled to his costs and disbursements.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For the First Claim for Relief:
    a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial,
    b. Non-economic damages in an amount to be determined at trial;
    c. An award of punitive damages; and
    d. For Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.



KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

2. For the Second Claim for Relief:
    a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial,
    b. Non-economic damages in an amount to be determined at trial;
    c. An award of punitive damages; and
    d. For Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.
3. For the Third Claim for Relief
    a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial,
    b. Non-economic damages in an amount to be determined at trial; and
    c. For Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.
4. For the Fourth Claim for Relief:
    a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial,
    b. Non-economic damages in an amount to be determined at trial; and
    c. For Hunter is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.
5. For the Fifth Claim for Relief:
    a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial; and
    b. Non-economic damages in an amount to be determined at trial.


KELL, ALTERMAN & RUNSTEIN, L.L.P.
ATTORNEYS AT LAW
520 SW YAMHILL, SUITE 600
PORTLAND, OR 97204
TELEPHONE (503) 222-3531
FACSIMILE (503) 227-2980

6. For the Sixth Claim for Relief

   a. Economic damages in an amount to be determined at trial to compensate Hunter for costs of incurred treatment, future medical costs, lost wages and lost earning capacity in an amount to be determined at trial; and

   b. Non-economic damages in an amount to be determined at trial.

7. For Plaintiffs' costs and disbursements incurred herein; and

8. For such other relief as the Court may deem just and reasonable.

DATED this 25th day of September, 2026.

s/ Zachary B. Walker
**THOMAS R. RASK, III**
OSB #934031
trask@kelrun.com
**ZACHARY B. WALKER**
OSB #115461
zwalker@kelrun.com
**JOHN W. MAYER**
OSB #215105
jmayer@kelrun.com
**STUART C. BARKER**
OSB# 254892
sbarker@kelrun.com
KELL, ALTERMAN & RUNSTEIN, L.L.P.
520 SW Yamhill St., Suite 600
Portland, OR 97204-1329
Telephone: (503) 222-3531
**Attorneys for Plaintiffs**